STATE OF CONNECTICUT *v.* DIANNE BROWN

HOUSE, C. J., COTTER, LOISELLE, MACDONALD and LONGO, Js.

Argued April 9—decision released June 17, 1975

*John M. Byrne,* for the appellant (defendant).

*Richard F. Banbury,* assistant state's attorney, with whom, on the brief, was *John D. LaBelle,* state's attorney, for the appellee (state).

COTTER, J.   The defendant was convicted by a jury of the crime of manslaughter in the first degree; General Statutes § 53a-55 (a) (3); and has appealed from the judgment rendered on the verdict. That statute penalizes a person who, "under circumstances evincing an extreme indifference to human life . . . recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." She assigns error in the court's denial of her motions for a directed verdict and to set aside verdict, in its charge to the jury and in certain evidentiary rulings.[1]

---

[1] The defendant's assignment of error in the court's denial of her motion to dismiss the information has not been briefed and is considered abandoned.

From a review of the evidence the jury could have found the following: On the evening of December 18, 1971, the Canton police department received a telephone call at approximately 10:40 p.m. from a woman who stated that she had just shot her husband. Responding to the call, Officer Stephen W. Cudworth proceeded to the defendant's home. Upon arrival, he spoke with the defendant and observed her husband's body lying on the floor next to the bed, with one leg on each side of one of the bedposts. In addition, Officer Cudworth saw that there were four holes in the top sheet on the bed next to where the body was located; the body was clad only in a sweatshirt and undershorts. Officer Cudworth observed an indentation in the pillow found on the side of the bed near the body.

Dr. Harold F. West, a Canton physician, called to the residence, pronounced Alexander M. Brown dead; he detected the odor of alcohol on the defendant's breath. A subsequent autopsy performed by Dr. Elliot M. Gross revealed that death had been caused by a gunshot wound of the right chest, and that the fatal bullet came to rest at a point three-and-one-half inches higher than the point of entry into the body.

Later that same evening the defendant was interviewed in her home by Sergeant John D. LaDucer of the Canton police department. After she had been properly advised of her constitutional rights, she told the sergeant that she and her husband had been drinking wine and talking together prior to the shooting, and that she had picked up a rifle in the living room, and, after loading it, followed her husband into the bedroom. She further informed

Sergeant LaDucer that while she was holding the rifle it discharged, and her husband fell to the floor; she did not explain why she had loaded the gun or how she happened to point it toward her husband.

The rifle used in the shooting of the victim is a single-shot, .22-caliber model that cannot be fired without first retracting the bolt and loading it, and then pulling back a knob or safety on the gun. The gun can then be fired only with a trigger pull in excess of four pounds.

During the trial, several expert witnesses appeared for the state, among whom were two employees of the Federal Bureau of Investigation. David M. Lattin, a special agent assigned to the F.B.I. laboratory, testified to his special training in the microscopic analysis of fibers, hairs, and related materials. His microscopic examination of the nose of the bullet taken from the body of Alexander Brown revealed five white cotton fiber particles adhering to the nose of the bullet. Agent Lattin performed a microscopic examination of the white cotton fibers taken from the nose of the bullet and the fabric composition of both the sheet and the sweatshirt which the victim was wearing at the time of his death. He had no way of knowing whether the fibers on the bullet came from the specific sheet in question. However, his examination disclosed five white cotton fibers on the front end of the bullet which were consistent with the fabric composition of the sheet but inconsistent with the fabric composition of the sweatshirt. In addition, he found four blue cotton fibers, of the same type noted in the composition of the sweatshirt, around two of the holes located in the sheet, while no foreign fibers were found on the sweatshirt.

Robert Frazier, another F.B.I. special agent, testified as to his special training in the field of weapons, ammunition and ballistics. He examined the same sheet with the four holes which agent Lattin had examined. That examination revealed a piece of unburned gunpowder on the margin of the lowest of the four holes in the sheet. Agent Frazier also found that the four holes in the sheet had the physical appearance of small caliber bullet holes on the order of a .22 caliber. He further testified that those holes in the sheet had characteristics consistent with the passage of a single bullet of approximately .22 caliber through two folds in the sheet. Agent Frazier also gave expert testimony describing the path of a bullet through fabrics in close proximity, including the interlocking propensities of fibers from the various fabrics and the capacity for the bullet to pick up fiber particles from the fabrics through which the bullet has traveled.

Dr. Gross, the chief medical examiner of the state, and an experienced forensic pathologist, testified to his prior professional experience involving cases in which bullet holes were found in various fabrics and materials. In conducting the autopsy he performed on the body of Alexander Brown, Dr. Gross passed a surgical probe instrument through the four holes in the bedsheet. It was his opinion that these holes were caused by a bullet passing through the sheet.

On the basis of this and other evidence, the state claimed to have proved, beyond a reasonable doubt, the defendant guilty of first degree manslaughter under § 53a-55 (a) (3), viz., that under circumstances evincing an extreme indifference to human life, she recklessly engaged in conduct which cre-

ated a grave risk of death to Alexander Brown, and thereby caused his death. A crucial element of the defense was that the deceased was not in bed at the time the bullet was fired as the state claimed, but that he was standing in a corner of the bedroom and that the gun went off in the defendant's hands accidentally as she entered the bedroom to prepare to go shooting ducks with her husband. Accordingly, during the trial, the defendant moved to strike that portion of Agent Lattin's testimony concerning the fibers on the bullet passing through the sheet and Agent Frazier's testimony that it was conceivable that the same bullet caused the holes in the sweatshirt and the sheet; the court denied the motion and the defendant excepted. The defendant thereafter filed with the court requests to instruct the jury to disregard such testimony of these two witnesses; the court declined to charge as requested, to which the defendant excepted. The defendant on appeal assigns error in the court's denial of the motion to strike the evidence and its refusal to instruct the jury as requested. We refer to the finding to determine the validity of such claims. *State* v. *Savage,* 161 Conn. 445, 446, 290 A.2d 221.

Concerning Agent Lattin's testimony, the defendant claims that since the witness had no way of knowing whether the fibers on the bullet came from a specific sheet on the victim's bed, there was no sufficient factual basis for his testimony that the fibers taken from the bullet could have come from the sheet. Agent Lattin's testimony on this point, the defendant argues, amounted to a mere possibility or supposition of the type which this court has held "will not sustain a legitimate inference of the existence of a fact." *General Petroleum Prod-*

*ucts, Inc.* v. *Merchants Trust Co.,* 115 Conn. 50, 58, 160 A. 296. In this case, however, there was a considerable amount of additional unchallenged evidence properly supporting an inference that the fatal bullet passed through the sheet in question. There was, for example, evidence that the body of the victim was found next to the bed from which the sheet was taken; that the victim was clad only in a sweatshirt and shorts; that the fibers on the bullet were inconsistent with the fabric composition of the sweatshirt but consistent with that of the sheet; that the sheet was pulled down farther on one side of the bed than the other; and that there was a residue of gunpowder on the margin of one of the holes in the sheet. We have stated that "[i]t is not any one fact, but the cumulative impact of a multitude of facts, which establishes guilt" in a case involving substantial circumstantial evidence. *State* v. *Walters,* 145 Conn. 60, 69, 138 A.2d 786, cert. denied, 358 U.S. 46, 79 S. Ct. 70, 3 L. Ed. 2d 45. In *Walters,* it was determined that although there was merely a scientific possibility that blood on the defendant's shirt came from the victim, evidence of the common grouping to which both blood samples belonged was admissible in light of the additional evidence linking the victim's blood with that on the defendant's shirt. Id., 68–70. Similarly, as the *Walters* principle is applied to the facts of this case, Agent Lattin's inability to trace the white cotton fibers taken from the bullet to the specific sheet taken from the bed with scientific certainty did not render inadmissible his testimony suggesting a linkage between the two pieces of physical evidence, when this testimony is viewed in light of all of the other evidence supporting the same inference.

The defendant has also attacked Agent Frazier's testimony that in his opinion the four holes in the sheet and the single hole in the sweatshirt were consistent with the path of a single projectile; essentially, the defendant claims that this witness' testimony was cast in terms of reasonable possibility and not of probability, so that it was inadmissible under the rule cited previously in *General Petroleum Products*. Again, there was substantial additional evidence supporting the inference raised in the challenged testimony. In addition to the testimony previously cited, for example, there was evidence that when the body of the deceased was found, there were four holes in the sheet with dark tracings around their perimeter; that there was blood around the hole of the sweatshirt which the deceased was wearing when he was found by Officer Cudworth; and that the perforations in the sheet were the result of the passage of a bullet. It was not error, then, for the court to admit Agent Frazier's testimony on the trajectory of the bullet. *State* v. *Walters,* supra.

The court did not err in denying the defendant's motion to strike the disputed portions of the testimony of Agents Lattin and Frazier, or in declining to instruct the jury to disregard that testimony.

Error is also assigned in the court's refusal to instruct the jury to disregard all evidence concerning the holes in the sheet and the victim's death, as requested by the defendant. While there was no "direct" evidence, as the defendant indicates, establishing a relationship between the holes in the sheet and the death of Alexander Brown, there was significant circumstantial evidence to which we have previously referred from which the jury might have

inferred the existence of such a relationship beyond a reasonable doubt. "There is no legal distinction between direct and circumstantial evidence so far as probative force is concerned." *State* v. *Cari,* 163 Conn. 174, 179, 303 A.2d 7; 30 Am. Jur. 2d, Evidence, § 1091. This evidence was properly placed before the jury for its consideration.

The defendant also claims error in admitting the testimony of Dr. Gross that in his opinion the four holes in the sheet were caused by a bullet path through the sheet. The basis of her objection was that there had been no prior testimony "connecting the sheet with Mr. Brown." The challenged testimony of Dr. Gross, however, did not refer to the death of the victim, but merely to the causal connection between the holes in the sheet and the firing of the bullet. His testimony to that effect was well within the scope permitted him as a qualified expert witness. See *State* v. *Grayton,* 163 Conn. 104, 111, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495; *State* v. *Smith,* 157 Conn. 351, 356, 254 A.2d 447. The court did not err in admitting Dr. Gross' testimony.

Finally, error is assigned in the court's denial of the defendant's motions for a directed verdict and to set aside verdict, because of alleged insufficiency of the evidence. The evidence printed in the appendices to the briefs, recited earlier, however, fully supports the verdict of the jury. The rulings of the court on the motion for a directed verdict and to set aside the verdict, then, were free of error. *State* v. *Hafner,* 168 Conn. 230, 242–43, 362 A.2d 925.

There is no error.

In this opinion the other judges concurred.