[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
I. Introduction
Michael B. Ross, the defendant, was convicted of six counts of capital felony and sentenced to death on each count. The defendant appealed. The Connecticut Supreme Court, on July 26, 1994, upheld the six capital felony convictions and reversed the penalty of death as to each count. See State v. Ross,230 Conn. 183. The Supreme Court remanded the case to the Superior Court for the purpose of conducting an entirely new sentencing hearing on each of the six capital felony convictions pursuant to53a-46b.
Prior to commencement of the first trial, on April 28, 1986, February 20, 1987 and March 3, 1987, State's Attorney C. Robert Satti engaged in telephone conversations with the state's expert witness, Dr. Robert Miller.
On April 15, 1999, the state tendered to the defense copies of three sets of notes (hereinafter "Satti notes"), which purportedly contain contemporaneous notes of the telephone conversations with Dr. Miller. Dr. Miller died in 1991.
The defendant, through his counsel, filed a Motion to Bar Prosecution pursuant to the Fifth, Sixth andFourteenth Amendments to the United States Constitution and Article I, Section 8 and 9 of the Connecticut Constitution, claiming that the Satti notes contain exculpatory information that was not disclosed to the defense in the first trial and the failure to CT Page 9658 disclose such information is in violation of the defendant's right to a fair trial under the due process clause of state and federal constitutions and that further prosecution would violate the defendant's protections against double jeopardy.
This court holds that information contained in the Satti notes was disclosed to the defense in a timely manner. The Motion to Bar Prosecution is denied.
II. Facts
A. Information Provided
It is not disputed that the following information was provided to the defense, prior to and during, the guilt phase of the Ross trial.
 1. the report of Dr. Robert Miller dated June 15, 1986 (Miller report); including the diagnosis of sexual sadism, DSM III 302.84.[1]
 2. the letter of Dr. Robert Miller dated February 15, 1987 (Miller letter).[2]
 3. the testimony of Dr. Robert Miller on June 2, 1987 (pp. 2964-301 5) during the guilt phase.
 B. Attorney Satti notes relevant to telephone conversations Dr. Miller.
Following the receipt of the Miller letter, Attorney Satti engaged in two separate telephone conversations on two separate dates with Dr. Miller. The so-called "Satti notes" consist of two sets of handwritten notes.[3] The notes are in the hand of Attorney Satti and were written contemporaneously with the telephone conversations with Dr. Miller and were intended to memorialize the salient contents of the Satti-Miller telephone conversations of February 20, 1987 and March 3, 1987.[4]
 C. Attorney Satti and Inspector Viens' notes relevant to meetings held with defense attorneys.
Following receipt of the Miller letter, Attorney Satti scheduled meetings with the defense attorneys.[5] Four meetings were held: two meetings on March 6, 1987 with Attorney Scilleiri; CT Page 9659 a meeting on March 10, 1987 with Attorney De Caprio; and a meeting on March 18, 1987 with both defense attorneys present. All four meetings were attended by Attorney Satti and Inspector Viens. Inspector Viens took notes simultaneously at all four meetings. Attorney Satti made notes shortly after the meeting on March 18, 1987.
The notes of these meetings are identified hereinafter as "Satti-Viens notes of meetings" as contrasted from the "Satti notes" of conversations with Dr. Miller.
D. Satti notes turned over to defense April 15, 1999.
On April 15, 1999, copies of the Satti notes relevant to Satti's telephone conversations with Dr. Miller were turned over to the defense.
The defense claims that the information contained in the Satti notes is exculpatory and was not previously disclosed to the defense.
III. Issues
 A. Did the state fail to disclose exculpatory information in violation of Mr. Ross' due process rights to a fair trial?
 B. Did the state engage in misconduct at the first trial whereby any subsequent trial would violate Mr. Ross' protections against double jeopardy?
IV. Discussion
A. Due process right to fair trial.
1. The Applicable Law.
It was held in Brady v. Maryland, 373 U.S. 83, 87,83 S.Ct. 11 94, 11 96, 10 L.Ed.2d 215 (1962), that the suppression by the prosecution of evidence favorable to an accused upon request[6] violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.
The Brady rule is based upon the requirement of due process. Its purpose is to ensure that a miscarriage of justice does not CT Page 9660 occur. United States v. Bagley, 473 U.S. 667, 682,105 S.Ct. 3375, 338087 L.Ed.2d 481 (1985). Impeachment evidence, as well as exculpatory evidence, falls within the Brady rule. Id. See Gigliov. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766,31 L.Ed.2d 104 (1972). Such evidence is "evidence favorable to an accused," Brady, supra, 87, 50 that if disclosed and used effectively it may make the differences between conviction and aquittal [acquittal].Bagley, supra, 3380. The Supreme Court has rejected any distinction between impeachment evidence and exculpatory evidence.
The United States Supreme Court further defined the Brady
rule in United States v. Bagley, supra, holding that undisclosed exculpatory evidence is material and that constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." The United States Supreme Court recently discussed several aspects of materiality under Bagley that "bear emphasis". Kyles v. Whitley, 514 U.S. 419,115 S.Ct. 1555, 1556-66, 131 L.Ed.2d 490 (1995). The court explained that a showing of materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. Id., 1566. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. The United States Supreme Court also emphasized that the Bagley test is not a sufficiency of evidence test. Id. One shows a Brady violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. State v. Esposito, 235 Conn. 802, 814-15.
It is well-established that impeachment evidence may be crucial to a defense, especially when the state's case hinges entirely upon the credibility of certain key witnesses. . . . The rule laid out in Brady requiring disclosure of exculpatory evidence applies to materials that might well alter . . . the credibility of a crucial prosecution witness. . . . Still, the seminal test remains whether there exists a reasonable possibility that the outcome of the proceeding would have been different had the evidence been disclosed to the defense." CT Page 9661Esposito, supra, 816.
In analyzing a Brady claim, the courts "must avoid concentrating on the suppressed evidence in isolation. Rather, we must place it in the context of the entire record. Evidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." (Citations omitted.) State v. Shannon, 21 7 Conn. 387, 399-400 (1989).
This court has stated that the "`mere possibility that an item of undisclosed evidence might have helped the defense ormight have affected the outcome of the trial . . . does not establish "materiality" in the constitutional sense.'" (Emphasis in original.) Shannon, supra, 402.
To establish a Brady violation, the defendant must show that (1) the government suppressed evidence; (2) the suppressed evidence was favorable to the defendant; and (3) it was material.State v. Esposito, 235 Conn. 802, 813.
a. Exculpatory nature of the information.
Our inquiry into the issue of whether the information was exculpatory is limited to the contents of the Satti notes of conversations with Dr. Miller on February 20 and March 3, 1987.
This court finds that the information contained in the Satti notes is relevant to impeachment and is "evidence favorable to the accused," which is in the nature of exculpatory information of which the state has a continuing duty to disclose.
b. Suppression.
Our next inquiry is whether the information contained in the Satti notes was suppressed by the State of Connecticut.
In order to assist the court in its determination, the court will review three areas: (1) the authenticity and accuracy of both Satti notes of conversations with Dr. Miller and the Satti-Viens notes of meetings with defense counsel; (2) the defense; and (3) the credibility of witnesses. CT Page 9662
(1) Authenticity and Accuracy of Notes.
The court will review the authenticity and accuracy of the Satti notes of conversations (of February 20 and March 3, 1987) with Dr. Miller and of the Satti-Viens notes of meetings with defense counsel.
It is noteworthy that Attorney Satti engaged in a custom of making notes of conversations and meetings with others contemporaneously in order to memorialize that which was said or that which transpired. As part of his custom of note taking, Attorney Satti enlisted his inspector to likewise make notes of conversations and meetings, usually simultaneously, with the conversation or meeting.
The entries by both Satti and Viens are made at a point in time when one's memory of the conversation or the event was still fresh in the mind of the entrant.
Authenticity refers to genuineness of the written notes or in the words of the Federal Rules of Evidence § 901(a) that the matter in question is what the proponent claims. Black's LawDictionary (West, Sixth Edition, 1990) defines "authentic" as genuine; true; real . . .; reliable; trustworthy . . . competent, credible, and reliable as evidence."
A physical and visual examination of the notes (the Satti notes and Satti-Viens notes of meetings) reveals that entries were made in pencil (except for a portion of the Satti notes of February 20, 1987, which are in ink). There is a "dullness" to the penciled entries which is appropriate to the notes not being newly created. There is no indication in the notes of any additions, deletions or alterations. The quality of the paper utilized, its size and color (yellow) is consistent.[7] The notes are dated and the representations that the notes were prepared on the date noted is consistent with the content of the notes and has not been challenged. Each set of notes appears to have been prepared at the time indicated. It is noteworthy that the defense has not contested the authenticity of the notes. The court finds the notes to be original and are what they purport to be. The notes are authentic.
The next area of inquiry is the accuracy of the Satti notes of the Miller conversations and the Satti-Viens notes of the CT Page 9663 meetings. The defense makes no challenge to the accuracy of the contents of the Satti notes of the Miller conversations. The defense claim is that the contents of the Satti notes were not revealed to the defense. In fact, it is the defense claim that the entries are accurate, reflect a change to the position of the state's expert, are exculpatory and were not disclosed.
Relevant to the Satti-Viens notes of meetings, the defense challenges as inaccurate only those portions of the Satti-Viens notes of meetings that are relevant to disclosure. The defense has not challenged any other entries including the recorded comments attributed to defense counsel. Apparently, that which is challenged is only that which is inconsistent with the defense theory of non-disclosure.
Generally, notes made contemporaneously with the events they are intended to memorialize are more accurate than recollections enunciated long after the events.
The entries appear to be objective. There is selectivity in all note taking except that which is recorded verbatim. The note taking herein was not verbatim.
There is no indication, and none has been suggested, of any improper selectivity in what was recorded (other than the entries relevant to disclosure).
It appears to the court that that which was selected was based upon what the entrant considered important as opposed to entries selected that were self-serving or support one party's position as opposed to the other. In the notes of the March 6th morning meeting, Inspector Viens noted that Attorney Satti discussed the Miller letter with the defense but "didn't show (the letter)" to the defense. This entry corroborates the defense claim, in part, that the defense did not view the entire Miller letter until June 3, 1987.
It is noteworthy that the notes served to refresh the recollection of defense in a multitude of areas. Much of the testimony of the defense attorneys corroborates and makes more reliable the Satti-Viens notes of meetings.
Another factor to consider in determining the accuracy of the Satti-Viens notes of meetings is the relative importance of the matters at hand. CT Page 9664
The case of State v. Michael Ross was significant and its importance lends to an inference of deliberateness and carefulness of entries made. The United States Supreme Court inFurman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346
(1972), effectively invalidated our previous death penalty statutes as violative of the federal constitution. The case of Michael Ross was the prosecution of an alleged serial killer. The case was one of the first cases, if not the first in Connecticut, to come before the state courts to test the new death penalty statutes that were enacted after Furman. Due to the significance of the case, one would infer a high degree of care to be employed in the handling of the case and in records made.
This court finds that the Satti-Viens notes of meetings were intended to serve as an internal record of conversations held. The notes were the work product of the office and were not intended to be disseminated to others outside the state's attorney's office. The fact that the notes of meetings was for internal use makes it unreasonable to infer that self-serving entries for a partisan purpose would be included.
Contemporaneous records made, in good faith, of conversations and events as they occur, lend to an inference of accuracy as opposed to the unaided memory of events or comments significantly past.
There is nothing in the evidence to suggest that the entries in the Satti-Viens notes of meetings relevant to disclosure were included by mistake or by design without a basis in fact. The matter at hand was of the utmost importance. The purpose of making a record was in order to minimize or obviate any disagreement as to what was said and done.
The court finds that the Satti notes of conversations with Dr. Miller and the Satti-Viens notes of meetings held are authentic and accurate.
(2) The Defense.
The defense attorneys took no notes nor employed any other method of recording the content of pretrial negotiations and meetings held.
The defense counsel testified that they do not recall the CT Page 9665 contents of the Satti notes being imparted to them at the first trial. They testified that the information in the Satti notes was of such significance that they would have recalled it, had it been disclosed in 1987.
The defense proffers the unaided memories of defense counsel after a 12-year hiatus to challenge the testimony of Attorney Satti and Inspector Viens. It is axiomatic that the passage of time does affect one's ability to retrieve and recall memory of events past.
It is clear to this court that the significant passage of time combined with the fact that no notes were made of pretrial negotiations or discussions in 1987 resulted, understandably, in sketchy recollections at best of the former defense counsel.
The defense possessed a copy of paragraph 3 of the Miller letter on March 6, 1987. The defense attorneys were, by their own accounts, taken aback by the revelations of paragraph 3.[8] The court is of the opinion that paragraph 3[9] was as significant a revelation as the reactions of counsel suggested.
Despite the "shocking" disclosure of paragraph 3,[10] the defense attorneys, in their testimony during the hearing, appear to minimize[11] the value and significance of that information that they admittedly did possess and, concommitantly, appear to emphasize or lend greater import to that information which they claim not to have been provided. This phenomena is accentuated by the fact that a significant amount of the information that the defense claims not to have been provided (the information in the Satti notes) is cumulative to that information they admittedly did possess.
The court attributes this to the vagaries of memory over the passage of time.
Aside from the testimony of Attorney Satti and Inspector Viens, the court does infer that the defense did have knowledge that Attorney Satti did engage in telephone conversations with Dr. Miller relevant to the contents of the Miller letter and discussed these matters with the defense in early March 1987. In open court on June 2, 1987,[12] Attorney Satti indicated that he discussed the Miller letter and the conversations he had with Dr. Miller with the defense. The defense attorneys are both highly skilled, professional attorneys. The record on June 2, CT Page 9666 1987 is silent as to any exception taken relevant to Attorney Satti's comments. The court infers from this silence a degree of knowledge of the contents of the Satti notes.
Present defense counsel argue that it is unreasonable to accept the state's version of disclosure because that would imply that the former defense counsel did not act on the information provided. The court does not draw this inference. The present defense counsel fails to place the assessment in the proper context: the assessment must be made through the eyes of former counsel in the context of the facts and circumstances in which they were immersed at the time in 1987.[13] The defense, in 1987, made an assessment and for reasons of trial strategy elected not to call Dr. Miller to the stand.
(3) Credibility
It is the province of the trier of fact to determine the credibility of the witnesses and the weight to be accorded their testimony. Where the evidence is in conflict, its probative force is for the trier.
It is important to note that 12 years have transpired between the events of 1987 and the discovery process for the new penalty phase hearing in 1999.
It is common knowledge that the passage of time has an effect on the memory of all. Witnesses' memories and perceptions often vary. This variance (is) due to . . . the differing vantage points of the observers and the mysteries of the associative processes of the human mind, is a normal and common phenomenon. Differing testimony does not, in and of itself, indicate a web of fabrication. . . . Whether there seems to be contradiction between different witnesses or confusion in the testimony, it is precisely this type of factual conflict that Anglo-American jurisprudence has traditionally entrusted to the (the trier of fact). State v. Gaynor, 182 Conn. 501, 504 (1980).
The effect of the notes is most significant. Issues of fact oftentimes depend upon the comparative credibility[14] of the parties. In virtually all cases, the trier of fact will search the record seeking out that corroborative evidence which will assist the trier in assessing the probative value of the respective witnesses' credibility. CT Page 9667
Before examining the corroborative evidence it is important to explain the meaning and purpose of corroboration. "Corroborate" is defined as "[t]o strengthen; to add weight or credibility to a thing by additional and confirming facts or evidence." Black's Law Dictionary (Rev. 4th Edition, 1951). The testimony of the witness is said to be corroborated when it is shown to correspond with the representation of some other witness, or to comport with some facts otherwise known or established. Id. "Corroborating evidence" is further defined as "[e]vidence supplementary to that already given and tending to strengthen or confirm it. Additional evidence of a different character to the same point." Id., (Rev. 5th Edition, 1979).
"The theory of corroboration is that a statement which has been shown true in some respects is reasonably likely to be true in the remaining respects." State v. lust, 185 Conn. 339, 361.
The court did find that the Satti-Viens notes of meetings held are authentic and accurate. Accordingly, the notes corroborate, to a significant degree, the testimony of Attorney Satti and Inspector Viens. This corroboration compels this court to give greater weight to the testimony of Satti and Viens relevant to disclosure.
Accordingly, the court finds that:
(1) At the meeting of March 6, 1987, Attorney Scilleiri was given a copy of paragraph 3 of the Miller letter;
(2) At the meeting of March 10, 1987, Attorney Satti reviewed the Satti notes of conversations with Dr. Miller with Attorney DeCaprio.
(3) At the meeting of March 18, 1987, Attorney Satti read the contents of the Satti notes of conversations with Dr. Miller of February 20 and March 3, 1987 to both defense counsel.
2. Finding
As was indicated previously, in order to establish a Brady violation, the defendant must show that (1) the government suppressed evidence; (2) the suppressed evidence was favorable to the defendant; and (3) it was material. All three elements must be proved in order for this court to find a Brady violation. In light of the court's findings that the information contained in CT Page 9668 the Satti notes was not suppressed, but was in fact disclosed to the defense, the defense has failed to prove an essential element. Therefore, the defense has failed to prove a Brady violation. This court need not consider the issue of materiality.
B. Protection Against Double Jepardy
1. Applicable Law.
The defense claims as its second basis to bar further prosection that the state engaged in prosecutorial misconduct at the first trial and any subsequent penalty phase hearing would violate defendant's protections against double jeopardy.
The double jeopardy clause of the fifth amendment to the United States constitution provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." Although the Connecticut constitution does not include a double jeopardy provision, the due process guarantee of Article First, § 9, of our state constitution encompasses protection against double jeopardy." State v. Nixon, 231 Conn. 545, 550,651 A.2d 1264 (1995).
Ordinarily, "the Double Jeopardy Clause imposes no limitation upon the power of government to retry a defendant who has succeeded in persuading a court to set his convictions aside, unless the conviction has been reversed because of insufficiency of evidence." Oregon v. Kennedy, 456 U.S. 667, 676, n. 6,102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). In Kennedy, the United States Supreme Court held that double jeopardy also bars a subsequent prosecution if there was prosecutorial misconduct in the first trial that goaded the defendant into seeking a mistrial. Id., 676. State v. Colton, 234 Conn. 683, 692.
The United States Court of Appeals for the Second Circuit recently held, however, that prosecutorial misconduct may be a bar to a trial even if there was no mistrial in the first case.U.S. v. Wallach, 935 F.2d 445 (2nd Cir. 1991) (Wallach I) cited inColton, supra, 692. The court in United States v. Wallach, 979 F.2d 912,913 (2nd Cir. 1992) (Wallach II) held that "[i]f any extension ofKennedy beyond the mistrial context is warranted, it would be a bar to retrial only where the misconduct of the prosecutor is undertaken, not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his conduct. . . ." The Connecticut CT Page 9669 Supreme Court has agreed with the Second Circuit Court of Appeals in this Kennedy extension. Colton, supra, 696.
Accordingly, the defendant must prove that the prosecution in the first trial engaged in misconduct with the intent "to prevent an acquittal[15] that the prosecutor believed at the time was likely to occur in the absence of his misconduct." Id.
2. Finding
The defense alleges as the basis for the prosecutorial misconduct is the failure of the state's attorney, in the first trial, to disclose exculpatory information relevant to telephone conversations Attorney Satti participated in with Dr. Robert Miller.
The court has previously concluded in this decision, that the state did disclose the subject information to the defense prior to or during the guilt phase of the first trial.
The defense has failed to demonstrate that prosecutorial misconduct which is a basis of their claim and a prerequisite to any showing of a violation of defendants' protection against double jeopardy has occurred.
V. Conclusion
The present defense failed in its burden to prove the non-disclosure of exculpatory information relevant to the Brady claim of a violation of the right to a fair trial. The present defense failed to prove prosecutorial misconduct relevant to the claim of a violation of the double jeopardy protections.
Accordingly, the Motion to Bar Further Prosecution is DENIED.
Miano, J.